UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHINYE AZUH,

    Plaintiff,

v.

PROVIDENCE-PROVIDENCE PARK
HOSPITAL,

    Defendant.

Case No. 17-10585
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [26]**

Chinye Azuh, who was born in Africa, spent the first year of her medical residency at Providence Park Hospital. She alleges that she was discriminated against on the basis of her race and because she was pregnant at the beginning of the residency program. And she claims those running the program retaliated against her after she complained about the discriminatory treatment. She further alleges that Providence unlawfully required that she take a neuropsychological exam.

Providence seeks summary judgment on all Azuh's claims.

For the reasons that follow, Providence's motion is granted in part and denied in part.

## I.

In March 2014, Chinye Azuh matched with Providence's family medicine program. (ECF No. 28-2, PageID.758.) Less than a month later, she informed Providence that her second child was due in August but that she only wanted seven days off after the delivery and "d[id] not want a leave of absence or a rotation extension." (ECF No. 28-3, PageID.805.)

Azuh started her residency in July 2014. (ECF No. 28-2, PageID.764.) During her orientation, some doctors noted concerns about Azuh's time management, her ability to sign

patients out, her need for additional support, and her ability to take a full patient load. (*See* ECF No. 26-16.)

After orientation, Azuh took maternity leave. (ECF No. 28-2, PageID.765.) Dr. Karen Mitchell, the director of the family medicine program, and the person who selected Azuh for the residency program (ECF No. 28-7, PageID.813), encouraged Azuh to take more than one week off after the birth of her child. Mitchell encouraged her, like she does all pregnant residents, to take three months off. (ECF No. 28-7, PageID.817.) Azuh agreed to take one month off but ended up returning less than a month later. (ECF No. 28-2, PageID.765.)

Soon after returning, supervising doctors continued to note concerns about Azuh's performance. For example, a September 30, 2014 note from Mitchell's weekly meetings with chief residents states that Azuh had trouble retaining information, that senior residents were concerned about her ability to do an accurate exam and so were verifying everything themselves, that she could not sign patients out, and that she missed things. (ECF No. 28-7, PageID.821–822.) On October 7, 2014, Mitchell noted that Azuh was observed just sitting in front of the computer for 40 minutes. (ECF No. 28-11, PageID.849.) She also received low to average scores in her faculty evaluations, especially with respect to her clinical competence, but those evaluations appear to generally improve as Azuh's first year progressed. (*See* ECF No. 28-30.) Azuh admits that attendings and other physicians spoke to her about her time management, patient assessment, and confidence in treating patients. (ECF No. 28-2, PageID.770.) When Mitchell later helped Azuh look for other residency programs, Mitchell admitted that Azuh's late start subjected her to increased scrutiny. (ECF Nos. 28-20; 28-21.)

Starting in September 2014, Azuh claims that she began complaining to Mitchell that she was being treated differently than the other residents because she had been pregnant. (ECF No.

28-2, PageID.799–800.) She does not recall whether she also spoke specifically about being treated differently because of her race. (*Id.*)

Three months later, in December 2014, Azuh met with her advisor, Dr. Martha Rumschlag. Azuh testified that at this meeting, Rumschlag "told [her] to leave the program," "told [her] that [her] contract would not be renewed," and that she "would sink, sink." (ECF No. 28-2, PageID.760.) She also testified that Rumschlag told her that it was in her best interest to look for another residency program. (*Id.*) She told Rumschlag about the bullying she was experiencing from other residents and attending physicians. (ECF No. 28-2, PageID.760.) This bullying included people laughing about her behind her back and ignoring her. (*See id.*) Rumschlag's response was that Azuh was being defensive. (*Id.*) Rumschlag also told Azuh that she needed to see a therapist "because in the days ahead [she] would require one." (*Id.*)

A few days later, Azuh met with Mitchell. (ECF No. 28-2, PageID.760.) Azuh spoke with Mitchell about her meeting with Rumschlag and expressed that she did not think that Rumschlag had her best interest at heart and wanted to switch advisors. (ECF No. 28-2, PageID.761.) Mitchell reminded her that Rumschlag was the chair of the Clinical Competency Committee (CCC) and asked, knowing this, whether Azuh still wanted to switch advisors. (*Id.*) Azuh said that she did, so Azuh was switched to another advisor—Dr. Thomas Anan. (ECF No. 28-2, PageID. 759, 761.)

Starting in December, Azuh started a new rotation with Anan in Novi. (ECF No. 28-2, PageID.771.) She was placed with him "to improve [her] clinical skills as part of [an] academic plan." (ECF No. 28-2, PageID.771.) That rotation went well. (ECF No. 28-2, PageID.772.)

In February 2015, the CCC met and discussed Azuh, which the CCC did after every rotation. (ECF No. 26-4, PageID.461; ECF No. 28-15, PageID.865.) Notes from that meeting reflect that the CCC had concerns about Azuh's ability to perform tasks in a timely fashion,

3

exercise independent judgment in patient management, and to make decisions. (ECF No. 28-15, PageID.865.) The notes also reflect discussions to develop a remediation plan, including that Azuh be in therapy and that she take a neuropsychological test. (*Id.*)

After the CCC meeting, Mitchell drove to Novi to meet with Azuh and Anan. (*Id.*) At that meeting, Mitchell "congratulated [Azuh] for doing well in this rotation" and relayed that she heard positive comments that Azuh's time management was improving, that her presentations were organized, and that she was ready to take an increased patient load. (ECF No. 28-2, PageID.772; ECF No. 28-16, PageID.867.) She also acknowledged Azuh's difficult transition into the residency and relayed the CCC's recommendation that she continue therapy and that she take a neuropsychological exam. (*Id.*) She also relayed goals she wanted Azuh to meet that matched the concerns raised at the CCC meeting. (ECF No. 28-15, PageID.865; ECF No. 28-16, PageID.867.) Azuh became upset that Mitchell wanted her to take the neuropsychological test and started crying. (ECF No. 28-2, PageID.772.)

During this time Azuh told Mitchell that she was seeing someone for mental health counseling. (ECF No. 28-2, PageID.772.) Azuh did not clarify that she was seeing her pastor for counseling until after Providence had required that she be in therapy. (*Id.*) When Mitchell told her that she needed to see a licensed psychologist, Azuh reluctantly did so. (ECF No. 28-2, PageID.772, 774.)

In April 2015, Azuh signed a contract for the second year of residency. (ECF No. 28-2, PageID.776.) But in July, the CCC met and recommended that Azuh's contract be terminated or that she be put on a remediation plan. (ECF No. 26-4, PageID.469.) Mitchell decided not to terminate Azuh's contract, but instead implemented a remediation plan. (ECF No. 26-4, PageID.470.) After the CCC meeting, Mitchell and Rumschlag met with Azuh, and Azuh was told

4

that her first year was going to be extended by three months. (ECF No. 28-2, PageID.776.) At this meeting, Azuh signed a performance enhancement plan, which included the three-month extension of her first year. (ECF No. 28-27, PageID.898.)

Azuh avoided taking the neuropsychological test until Providence went ahead and scheduled it for her in September 2015. (ECF No. 28-2, PageID.775; ECF No. 28-32, PageID.987.) The exam was scheduled after Azuh completed an overnight ICU shift. (ECF No. 28-2, PageID.797.) Azuh left after four hours—about half way through the exam. (ECF No. 28-2, PageID.797–798.)

Azuh resigned from the program on September 30, 2015. (ECF No. 28-5, PageID.807.) She then started another residency program in Tennessee in the field of psychiatry. (ECF No. 28-2, PageID.789–790.)

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

## III.

### A.

Providence first argues that Azuh's claims are barred by the statute of limitations. Providence relies on the employment application Azuh signed with the hospital that bound her to bring claims within 180 days of their occurrence. And, says Providence, far more than 180 days lapsed before she brought suit.

Azuh disagrees that this employment application governs. She argues that a separate Resident Agreement governs her residency program and employment with Providence, and that Resident Agreement did not contain a 180-day limitations period.

The Court agrees with Azuh.

"Under Michigan law, the purpose of contract interpretation is 'to ascertain the intention of the parties.'" *Reardon v. Kelly Servs., Inc.*, 210 F. App'x 456, 458–59 (6th Cir. 2006) (quoting *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005)) (internal quotations omitted). "Whenever possible, the parties' intent is to be discerned from 'the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument.'" *Id*. (quoting *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003).

On April 3, 2014, Azuh signed a Residency Agreement that concerned the first year of the residency program at Providence. (ECF No. 26-13.) This agreement recited the obligations of the resident and hospital under the program, the resident's compensation and benefits, grounds for termination, and appeal rights. (*Id*.) The "purpose of th[e] [a]greement [was] to furnish [Azuh] with post-graduate medical training" and it advised that her employment with the hospital would not extend beyond her post-graduate medical training. (ECF No. 26-13, PageID.597.) Thus,

"termination of [Azuh's] employment [was] in accordance with [the] Agreement and . . . not according to Hospital general employment policies." (*Id.*) So the Residency Agreement concerned both the educational and employment components of Azuh's residency.

The agreement also had an integration clause which is "conclusive evidence that the parties intended the document to be the final and complete expression of their agreement." *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002). The agreement stated that it was the entire agreement between the parties regarding Azuh's participation in the residency program and superseded any and all discussions and other agreements regarding this subject. (ECF No. 26-13, PageID.597.) It further provided that "no modification of, or addition to" the agreement is valid "unless it is in writing and signed by the Director of Medical Education or the Designated Institutional Official and by [Azuh]." (*Id.*)

A few weeks after signing the Residency Agreement, Azuh signed an employment application with Providence. (ECF No. 26-15.) As argued by Providence, the application provided that the applicant "agree[d] not to commence any action or suit relating to [the] application or employment with [Providence] more than 180 days after the date of the event giving rise to the action or suit." (ECF No. 26-15, PageID.608.)

But this employment application was not signed by the Director of Medical Education or a Designated Institutional Official. It was signed only by Azuh. So the later signed employment application did not modify the Residency Agreement. And because the Residency Agreement does not have a 180-day limitations period, the Court finds that Azuh's claims are not barred by the statute of limitations.

**B.**

Azuh raises three Title VII claims: two discrimination claims and one retaliation claim.[1] Providence also seeks to dismiss them on the merits.

The Court starts with the discrimination claims.

**1.**

While the prima facie tests for race and pregnancy differ slightly, both require that Azuh suffered an adverse employment action. *See Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (laying out prima facie test for pregnancy discrimination); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (laying out prima facie test for race discrimination). Azuh argues that the adverse employment action was that she was constructively discharged from her residency program.

Providence argues that no reasonable jury could find that conditions of her employment rose to the level of constructive discharge and therefore these claims fail.

The Court agrees.

"A constructive-discharge claim is hard to prove." *McDonald v. UAW-GM Ctr. for Human Res.*, 738 F. App'x 848, 856 (6th Cir. 2018) (internal quotations omitted). "'To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.'" *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001)). The Court considers the following factors in determining

---

[1] While Azuh brings claims under both federal and state law, neither party provided separate analysis for the state-law claims. So the Court will treat the state-law claims as though they rise and fall with the federal claims.

whether a reasonable person would have felt compelled to resign: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [white or male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* (quoting *Logan*, 259 F.3d at 569). "The employee has an obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991) (internal quotation marks and citation omitted). "The doctrine does not protect employees who leave their job 'in apprehension that conditions may deteriorate later.'" *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018) (quoting *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002)).

Without citing to the record, Azuh argues that Rumschlag's comments, bullying from other residents and attending physicians, the requirements that she see a psychologist and undergo neuropsychological testing, the CCC's recommendation of termination, Dr. Mitchell's recommendation that her first-year contract be extended in lieu of termination, being "stripped" of credits, and being held under close scrutiny amounted to intolerable work conditions that would compel a reasonable person to resign. (ECF No. 28, PageID.736–737.)

The Court discusses these allegations in more detail below.

To start, the Court notes that Azuh's problem with the number of credits she received during her transfer occurred after she resigned from the program. (ECF No. 28, PageID.733.) So this action cannot be considered part of the conditions that led Azuh to resign.

As for experiencing bullying, Azuh alleges that residents would talk about her, "whisper about [her] behind [her] back" and "say [she] was slow." (ECF No. 28-2, PageID.761.) In one

9

instance, an attending said to other residents "'Oh, my God, Chinye's on the floor. Oh, my God, we got Azuh on here,' and they all started laughing." (ECF No. 28-2, PageID.761.) Azuh also cites as an example of bullying an incident after a formal dinner. (ECF No. 28-2, PageID.762.) Azuh greeted an attending physician who did not respond to her; instead the physician turned to another resident, said "hi," gave her a hug, and told two residency candidates that the person is one of the best residents. (ECF No. 28-2, PageID.762.) Another incident involved a doctor getting angry with Azuh over a discharge summary and telling her to "get out of her office." (ECF No. 28-2, PageID.762–763.) Azuh does not explain how these incidents rise to the level of bullying, which is defined as "abuse and mistreatment of someone vulnerable by someone stronger, more powerful, etc." MERRIAM WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/bullying (last visited May 10, 2019). And especially for future doctors who are being trained to handle life and death situations, the Court cannot find that these examples rise to the level of intolerable residency conditions.

Azuh also complains that Rumschlag "told [her] to leave the program," "told [her] that [her] contract would not be renewed," "that [she] would sink, sink," "that it was in [her] best interest to start looking for another residency program," that "residents were not happy with [her] on the floors," that she "was too slow," and that "someone said [she] was staring at the computer." (ECF No. 28-2, PageID.760.) When Azuh told Rumschlag that she felt bullied, Rumslaugh told her that she was "being defensive." (ECF No. 28-3, PageID.760.) Rumschlag also told her that she "had to see a therapist, because in the days ahead [she] would require one." (ECF No. 28-3, PageID.760.) Azuh also believes that "Rumschlag was leading a campaign" against her, "writing evaluations on behalf of other doctors and putting it in [her] evaluation portfolio" and "writing falsehoods and embellishing all sorts of stuff." (ECF No. 28-2, PageID.763.)

10

Azuh also points to Mitchell. Mitchell told Azuh that she had to go to psychotherapy and take a neuropsychological exam. (ECF No. 28-2, PageID.760–761.) When Azuh asked Mitchell to switch advisors so Rumschlag was no longer her advisor, Mitchell warned her that Rumschlag was the chair of the CCC. Azuh also testified that Mitchell would always make phone calls around her and now she thinks "she was getting notes on me and information from [other residents]." (ECF No. 28-2, PageID.763.) Azuh admits that the residents never told her they took calls from Mitchell about her, but Azuh "just assumed" that was the case. (ECF No. 28-2, PageID.763.)

Even taking everything into account, no reasonable jury could find that Azuh has met the high bar of establishing constructive discharge. True, Rumschlag was critical of her, but "this circuit has repeatedly held that an employer's criticism of an employee does not amount to constructive discharge—especially when the employer's criticism is limited to a few isolated incidents." *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 631 (6th Cir. 2018); *see also Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012). And while other residents and physicians may have been gossipy and mean to her, the behavior did not rise to the level of creating an intolerable environment. The alleged bullying—although seemingly petty and unnecessary—was relatively minor. People gave her the cold shoulder, talked behind her back, and were critical of her. This pales in comparison to the "severe," "constant stream of invective" such as repeated comments that an employee is "a piece of shit," "worthless," and "a f****g cripple," that has amounted to constructive discharge. *McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 535 (6th Cir. 2011).

According to Providence, requiring that Azuh be in therapy and take a neuropsychological test was done to try to help her succeed in the program. Azuh assumed the worst from these requirements. But that does not make them objectively hostile or intolerable. Nor does Azuh's

subjective belief that these were done to force her to quit. *See Henry v. Abbott Labs.*, 651 F. App'x 494, 507–08 (6th Cir. 2016).

And far from supporting a constructive discharge claim, Mitchell's conduct was geared toward helping Azuh successfully complete the program. Azuh complains about Mitchell extending the program a few months. True, constructive discharge can occur where, "based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (quoting *EEOC v. Univ. of Chicago Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002)). And the CCC did recommend that Azuh leave the program. (ECF No. 28-7, PageID.833.) But Mitchell, who oversaw the residency program, did not follow that recommendation and instead implemented a remediation program. (ECF No. 28-7, PageID.834.) And while Mitchell did remind Azuh that Rumschlag was the chair of the CCC, she also granted Azuh's request for a new supervisor given her problems with Rumschlag. (ECF No. 28-2, PageID.760–761.) And she worked with Azuh on meeting the goals of the program. (*See* ECF No. 28-16, PageID.867; ECF No. 28-17, PageID.869.) No reasonable jury could find that deciding not to terminate Azuh and instead giving her another chance is communicating that "the axe was about to fall." *Laster*, 746 F.3d at 728.

Even construing all of Azuh's complaints in a light most favorable to her, no reasonable jury could find that Azuh was subject to an intolerable work environment intended to force her out.

Azuh's Title VII discrimination claims are dismissed. [2]

---

[2] Also fatal to Azuh's race-discrimination claim is that she fails to identify similarly-situated Caucasian residents who were treated differently from her, i.e., were struggling in the same ways she was, as reflected in her evaluations, but were not subject to the same requirements. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016).

**2.**

Azuh's Title VII retaliation claim does not fare any better.

Azuh alleges that she complained to Dr. Mitchell about the discriminatory conduct and was retaliated against because of it. To "establish a prima facie case of retaliation [under Title VII,] a plaintiff must establish that: (1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (internal quotation marks omitted). And "the final element requires proof of so-called 'but-for' causation," i.e., that the unlawful retaliation would not have occurred but for the employee's protected conduct. *See Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018); *MacEachern v. Quicken Loans, Inc.*, No. 17-1005, 2017 WL 5466656, at *5 (6th Cir. Oct. 17, 2017). "'Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently than similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.'" *Henry*, 651 F. App'x at 505 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000)).

While "[t]he 'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII race discrimination claim," *Laster*, 746 F.3d at 719, Azuh is relying on constructive discharge for both. And, as discussed, there is no genuine issue of material fact as to whether Azuh was constructively discharged.

13

The Court recognizes, however, that "Plaintiff's burden of establishing a materially adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'" *Laster*, 746 F.3d at 731 (citations omitted). Thus, while not clear from the briefing, it may be that Plaintiff is alleging that the mistreatment by her peers and supervisors was the materially adverse action. But Azuh has not cleared this causation hurdle either. Azuh alleges that she first complained about being harassed and not being treated like everyone else in September 2014. (ECF No. 28-2, PageID.799.) But Azuh does not explain how her complaining about this conduct caused what followed—seemingly the same treatment by her peers and supervisors. In other words, that Azuh was treated poorly before she complained about the harassment and that same treatment continued after she complained, does not establish the complaining was the cause of the mistreatment.

There are other issues with temporal proximity. Azuh received negative reviews starting in July 2014, several months prior to her complaints to Mitchell. (ECF No. 26-18.) And Providence did not recommend that Azuh continue her therapy and complete the neuropsychological exam until five months after her complaints, in February 2015. (ECF No. 28-16, PageID.867.) Further, nothing in the email to Azuh relaying these requirements suggests that they were imposed because she complained about harassment a year prior. (ECF No. 28-16.) To the contrary, the letter makes clear that these were steps to try to help her succeed in the residency program. (*See id*.) And Azuh does not provide evidence to suggest otherwise. Azuh does not even make a separate argument for why her complaints caused the adverse action, instead relying on her disparate treatment arguments. (ECF No. 28, PageID.740 ("As explained above, the same evidence regarding [Azuh's] disparate treatment also establishes a factual question regarding causation.").) But whether her treatment was caused by her race or pregnancy is different than whether she was retaliated against

14

for engaging in a protected activity. So absent any "evidence to deduce a causal connection," *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 746 (S.D. Ohio 2011), *aff'd*, 504 F. App'x 473 (6th Cir. 2012), no reasonably jury could find that but for Azuh complaining to Mitchell about being harassed, she would not have experienced the same mistreatment by her peers and supervisors.

## C.

Azuh also claims that Providence discriminated against her by requiring that she take a neuropsychological exam in violation of the Americans with Disabilities Act.[3]

Under the ADA, an employer cannot require that an employee take a medical exam unless it is job-related and consistent with business necessity. 42 U.S.C. § 12112. Providence argues that the neuropsychological exam was not a medical exam as understood by the ADA. Instead, the exam was only going to be used to create an education plan for Azuh. The email memorializing the recommendation stated, "[w]e do not use [the exam] to diagnose psychiatric disorders; the testing would be very specific about your learning modes, thought processing, etc." (ECF No. 28-16, PageID.867.) Providence also says it did not require that Azuh take the exam, as evidenced by the fact that she never completed it and there were no consequences. Lastly, Providence argues that, even if the test was a medical exam and was required, it did not run afoul of the ADA because

---

[3] The subject of this claim is covered in Count IV of Azuh's complaint. (ECF No. 1, PageID.30–34.) That count also references Providence "regarding" Azuh as disabled. It is unclear whether Azuh meant to bring this as a separate ADA claim. Azuh does not mention this claim in her response and Providence does not address the possibility that this was meant to be a separate claim until its reply brief. (ECF No. 29, PageID.993–995.) Even if Azuh did mean to bring this as a separate claim yet failed to make it a separate count, the claim fails as a matter of law because no reasonable jury could find that Providence regarded Azuh as disabled such that she was unable to work. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 893 (6th Cir. 2016).

15

Providence had concerns about Azuh's ability to perform her job safely and thus, the exam was a business necessity.

While not binding, EEOC guidance provides a helpful framework in determining whether an employment-related exam falls within the ADA's prohibition on medical exams. *See Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 815 (6th Cir. 2012). The EEOC defines a "medical exam" as a "procedure or test that seeks information about an individual's physical or mental impairments or health." EEOC, *Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees*, at 5–6, https://www.eeoc.gov/policy/docs/guidance-inquiries.html. And it lists the following as factors that should be considered in determining whether a test is a medical examination: "(1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used." *Id*. at 6. As illustration, the EEOC provides that "psychological tests that are designed to identify a mental disorder or impairment" are considered mental examinations, but "psychological tests that measure personality traits such as honesty, preferences, and habits" are not. *Id*. It is the EEOC's position that "'[t]raits or behaviors are not, in themselves, mental impairments.'" *Kroll*, 691 F.3d at 816 (quoting EEOC, Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities (1997), http://www.eeoc.gov/policy/docs/psych. html.). "Thus, the EEOC instructs that to determine whether something constitutes a 'medical examination' one must consider whether it is likely to elicit information about a disability, providing a basis for discriminatory treatment." *Id*.

Here, while close, a genuine issue of material fact exists as to whether the neuropsychological exam that Providence arranged for Azuh is a medical exam for ADA purposes. As to the first (EEOC) factor, the test was administered by a health care professional—a doctor. (ECF No. 28-2, PageID.775). The test results were also presumably going to be interpreted by that doctor, or others at Providence. As to the third factor, "arguably the most critical in this analysis," *Kroll*, 691 F.3d at 819, even though Mitchell assured Azuh that the exam was not going to be used to diagnose a psychiatric disorder, it is not clear whether the test was designed to reveal such disorders or other mental health issues. (*See* ECF No. 28-7, PageID.829 ("Neuropsych testing can be done for more cognitive evaluation and for more medical diagnoses.").) Indeed, neuropsychological testing appears to have a broad function and purpose. Neuropsychological Evaluation FAQ, Department of Neurology, University of North Carolina Chapel Hill, https://www.med.unc.edu/neurology/divisions/movement-disorders/npsycheval/ ("Neuropsychological evaluation is an assessment of how one's brain functions, which indirectly yields information about the structural and functional integrity of your brain."). And Azuh testified that she believed the purpose of requiring her to take the exam "was to show that [she] was incompetent in some way in order to [get her out of the program] . . . that [she] had some sort of deficit in functioning." (ECF No. 28-2, PageID.793.) So factual issues remain as to whether the neuropsychological exam was a medical exam as understood by the ADA. *See Kroll*, 691 F.3d at 820 ("Upon considering factors one, two, and particularly three, we conclude that Kroll has presented sufficient evidence such that a reasonable jury could conclude that the 'psychological counseling' Kroll was instructed to attend did constitute a 'medical examination' under the ADA. We reach this conclusion, consistent with the reasoning of the Seventh Circuit, because the 'psychological counseling' in question was likely to probe and explore whether Kroll suffered

from a mental-health disability, regardless of whether this was WLAA's intention"); *Rivero v. Bd. of Regents of University of New Mexico*, No. CIV 16-0318, 2019 WL 1085179, at *84 (D.N.M. March 7, 2019) ("Regardless whether it was UNM's intention to determine if Dr. Rivero suffered a mental disability, that the psychiatric evaluations could uncover one is enough for a reasonable jury to conclude that they are a medical examination for Rehabilitation Act purposes.").

Next, it is a disputed question whether the exam was required. The letter from Mitchell to Azuh suggests that the exam was optional. It read, "As I discussed with you, we would like your mental health provider's opinion about whether or not [the neuropsychologic exam] might be helpful in your education. A simple letter stating yes or no from your mental health provider would be acceptable. (You could simply choose 'yes' yourself, too)." (ECF No. 28016, PageID.867). But Mitchell's later testimony suggests that the exam was required. She was asked whether Azuh "ha[d] to undergo a neuropsychological test?" and said, "Yes. Or we—we told her that was the expectation. And in fact when [another resident] did not do it, we had her leave the program." (ECF No. 28-7, PageID.828.) And Azuh testified that, after she delayed taking the exam, Providence just booked it for her. (ECF No. 28-2, PageID. 775 ("[The neuropsychological exam was] something that they had said that I had to do in 2014. So it took me like a year, because I did not—I kept refusing it until they eventually got tired and just booked it.").)

And Providence cannot show as a matter of law that the test was a business or safety necessity. "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can 'perform job-related functions.'" *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)

18

(citing 42 U.S.C. § 12112(d)(4)(B)). Providence does amass numerous evaluations and reports that express concern about Azuh's patient care. (*See* ECF No. 26-18, PageID.623–638; ECF No. 29-3, PageID.1010–1030.) But, Azuh argues, her evaluations varied (*see* ECF No. 28-30, PageID.901, 908, 911, 915, 917, 920, 923, 926, 929, 932) and, taking the facts in the light most favorable to her, a jury could find that a reasonable person would not have doubted her ability to perform the job. According to Providence, the purpose of the neuropsychological exam was to determine Azuh's learning style and was to be used solely to determine her "learning modes." But Providence does not explain how determining Azuh's learning modes would ascertain or improve her ability to perform the job. And while this may have helped Azuh to become a better resident, there is nothing that suggests it was necessary in order to perform the tasks of a resident. So a jury must decide whether Providence required that Azuh take a neuropsychological exam in contravention of the ADA.

**IV.**

For the reasons stated, Providence's motion for summary judgment (ECF No. 26) is GRANTED IN PART AND DENIED IN PART. Azuh's ADA claim based upon the neuropsychological exam remains.

IT IS SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: May 10, 2019

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, May 10, 2019, using the Electronic Court Filing system.

                                      s/William Barkholz
                                      Case Manager